IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DONALD MARTIN,

                          Plaintiff,                    OPINION AND ORDER

          v.                                            22-cv-42-wmc

JAIME ADAMS, SHERYL KINYON,
SARAH MARTIN, TAMMY WEST,
ERIN WEHRLE, MICHAEL GROSS,
and JUSTIN RIBAULT,

                          Defendants.

Through his counsel, state prisoner Donald Martin contends that medical staff at the Wisconsin Secure Program Facility ("WSPF") failed to provide him adequate medical treatment for a skin condition. Before the court are motions for summary judgment filed by the state defendants collectively (Jaime Adams, Sheryl Kinyon, Sarah Martin, Tammy West, Erin Wehrle and Justin Ribault (dkt. #30)), and by defendant Michael Gross, a privately employed physician who provide medical services under contract (dkt. #39). In considering defendants' motions, the court must view the evidence in the light most favorable to Martin. Even in this light, however, Martin has failed to show that any defendant violated his constitutional rights. Thus, defendants' motions will be granted as to Martin's constitutional claims, and the court will decline supplemental jurisdiction over his negligence claims, closing this federal case.

PRELIMINARY MATTERS

Before turning to defendants' summary judgment motions, the court must address two preliminary matters: (1) plaintiff's meritless motion for default judgment against

defendant Gross (dkt. #59); and (2) defendants' arguably meritorious motions to strike plaintiff's summary judgment response materials (dkt. #62 and dkt. #63).

First, in response to defendant Gross's individual motion for summary judgment, plaintiff filed a motion for default judgment against him based on an alleged failure to respond to discovery requests.  Specifically, plaintiff's counsel represents that he sent discovery requests to Gross's counsel via U.S. mail on February 22, 2023, but never received a response.  Rather, the requests were returned as undeliverable, which plaintiff characterizes as Gross's deliberate act of default.

To begin, a motion for default judgment is appropriate when a party "willfully disregards pending litigation." *Sun v. Board of Trustees of University of Illinois*, 473 F.3d 799, 811–12 (7th Cir. 2007).  This obviously does not apply to defendant Gross, who not only filed an answer but affirmatively moved for summary judgment.  Moreover, when a party fails to respond to discovery requests, the appropriate action is for the serving party to confer with the recipient and attempt to resolve the matter.  Fed. R. Civ. P. 37(a)(1).  Then, if the efforts to meet and confer fail to resolve the issue, a party may file a motion to compel discovery responses with the court.  *Id.*  Plaintiff does not state that he even attempted to call or email Gross's counsel about the returned discovery requests to obtain an updated address or alternative method of serving the requests.  Nor does he indicate any offer to meet and confer, and he certainly did not move to compel responses.  Instead, he filed an improper motion for default judgment that must be denied.

Second, defendants' contend that plaintiff's response to their motions for summary judgment were so defective as to constitute no opposition at all.  On July 26, 2023, after

missing his initial July 7 deadline for filing his opposition materials, plaintiff requested an additional 45 days to respond to defendants' motions for summary judgment.  (Dkt. #53.) Plaintiff's counsel provided no good reason for the extension, but the court nevertheless gave him until August 21 to respond to summary judgment.  On August 22, plaintiff filed materials in response to summary judgment, including responses to defendants' proposed findings of fact, his own proposed findings of fact, and a "Declaration of Plaintiff Donald Martin" (dkt. #60).

There are several problems with plaintiff's responsive materials.  First, plaintiff did not sign his own "declaration"; his attorney signed it.  Second, the declaration contains statements for which neither plaintiff nor his attorney could conceivably have personal knowledge.   Third, plaintiff submitted additional evidentiary materials without a supporting affidavit or declaration from someone capable of attesting to their foundation or authenticity.  Worse still, even after court staff informed plaintiff that his exhibits had been filed improperly (dkt. #61), plaintiff failed to correct this t error.  *See* Fed. R. Civ. P. 56(c)(4), Fed. R. Evid. 602 (declarations to be based on personal knowledge); 28 U.S.C. § 1746 (declarations must be signed by the declarant); and Preliminary Pretrial Conf. Ord., at 6, II.E.1 (same).

Given these defects, defendants move to strike all of plaintiff's responsive materials, which is at least arguably a reasonable and appropriate action in light of many errors by a represented party.  However, the court will deny these motions as moot, because even if the court accepts and considers all the evidence plaintiff submitted that is even arguably within his personal knowledge or is otherwise admissible, plaintiff has failed to identify a

genuine dispute of material fact sufficient to defeat defendants' motions for summary judgment.

## UNDISPUTED FACTS[1]

Plaintiff Donald Martin was incarcerated at WSPF from September 2015 to July 2021. Before his incarceration, he had been diagnosed with folliculitis, a skin condition often caused by a bacterial infection and resulting in hair follicles becoming inflamed. Martin's folliculitis was severe enough that he was prescribed minocycline, a tetracycline-class antibiotic commonly used to treat acne.[2] One potential side effect of this antibiotic's long-term use is minocycline-induced hyperpigmentation, which is characterized by blue, black, brown or gray pigmentation in the skin and likely caused by deposits of pigmented minocycline metabolites in the skin. This condition is cosmetic, and does not cause known symptoms aside from the pigmentation.[3]

Martin began complaining about discoloration on his legs in October 2019. Specifically, on October 30, 2019, he submitted a health service request ("HSR") to WSPF medical staff in which he complained of pain from a flu shot and asked for his legs to be

---

[1] The following facts are drawn from the parties' proposed findings of facts and responses, and were undisputed except where noted. As noted above, the court has considered plaintiff's evidentiary materials only to the extent that the averments or other evidence would be within plaintiff's or his counsel's personal knowledge or would otherwise be admissible.

[2] It is not clear from the record when Martin first started taking minocycline. According to one medical record, Martin started taking minocycline in December 2018, but Martin told a physician in October 2021 that he had been taking it for approximately six years.

[3] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4120055/;
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4731832/;
https://webeye.ophth.uiowa.edu/eyeforum/cases/213-minocycline.htm.

"checked out."  At that time, Martin did not report any pain in his legs or state that his concern was urgent, and defendant Tammy West, a nurse in WSPF's health services unit ("HSU"), responded by informing Martin that he was scheduled to be seen by medical staff.  Martin was then seen by a non-defendant nurse 10 days later.  During this exam, Martin complained of shoulder pain, finger numbness, and discoloration of his shins.  The nurse's note further states that Martin had normal sensation in both legs and feet and denied having any pain, numbness, itching or discomfort in his legs, although Martin now says that he reported both pain and burning in his legs.

Martin's next medical appointment was on November 20, 2019, with a non-defendant, Dr. Gavin, regarding his ongoing shoulder pain.  Martin also asked the doctor to look at the discoloration in his legs during the appointment.  Gavin's notes state that upon inspection, his legs were not red or tender, and that the discoloration was flush to the skin and somewhat concentrated at his hair follicles.  Dr. Gavin noted that Martin's discoloration might be related to his folliculitis,[4] and she ordered labs to ensure that the discoloration did not have a more serious cause.  Those lab results came back normal.

Martin also saw defendant West for another appointment on December 19, 2019, regarding continued pain from his flu shot.  At that appointment, he asked Nurse West about the next steps related to his leg discoloration, telling West that the discoloration was getting "worse" and he was worried about blood clots.  (Martin says he also told West that

---

[4] Folliculitis can cause post-inflammatory hyperpigmentation, which occurs when skin makes extra melanin after it has been irritated or injured.  *See* https://www.mayoclinic.org/diseases-conditions/folliculitis/symptoms-causes/syc-20361634; https://www.ncbi.nlm.nih.gov/books/NBK559150/.

his legs were in pain, although West denies this and made no notes of reported leg pain.) West told Martin that he would see an advanced provider at the end of January.

On December 26, 2019, Martin submitted an HSR asking to discuss his medications and the discoloration on his legs, although he again did not report any related pain. Nurse West responded reminding Martin that he had an appointment with a provider scheduled for late January. Martin submitted another HSR on January 9, asking to be seen about his legs, but again not mentioning any pain. Defendant Wehrle (also a nurse) reviewed this request, again reminding him that he had a provider appointment scheduled later that month. At the time they examined Martin, neither Nurse West nor Nurse Wehrle knew that minocycline could cause skin discoloration.

The late January appointment never happened due to medical staff shortages at WSPF and the need to prioritize urgent medical needs.[5] Instead, Martin met Nurse West again on February 5, 2020. West examined Martin's legs and noted no signs of infection or pain, though again Martin claims he reported pain. Approximately one month later, on March 4, Nurse Wehrle met with Martin and told him that he would be seeing an advanced provider about his legs the following week.

On March 11, 2020, Martin met with Dr. Ribault, also a named defendant, via videoconferencing to discuss the discoloration on his legs. According to Dr. Ribault, Martin reported that the discoloration had started approximately two years before and worsened in the past 4–6 months. However, nothing in Ribault's note reflect Martin

---

[5] Defendant Sarah Martin, who scheduled provider and outside appointments at the prison, was never instructed to prioritize Martin's appointment or to schedule him as urgent, making his appointment something that could be cancelled and rescheduled in favor of higher priority matters.

having reported pain or other symptoms from the discoloration, though at the time, he did report lower back pain that radiated down his left leg for which he was already taking gabapentin, meloxicam and baclofen.  Also at the time, Ribault was aware that minocycline could cause skin discoloration in some cases, but he did not believe it was causing Martin's discoloration because his file appeared to show that he had started taking minocycline in December 2018, while Martin reported that his discoloration had started before then. Thus, Dr. Ribault ordered updated labs for Martin to rule out inflammation, infection, injury, or chronic disease that might be causing the discoloration; he also reviewed the notes from Dr. Gavin's previous visit with Martin in which Gavin noted potential hyperpigmentation from folliculitis.

Martin's lab results again came back normal, with the exception of a high level of thyroid stimulating hormone (TSH).  In response, Dr. Ribault ordered medication to treat hyperthyroidism, and subsequent labs showed that Martin's TSH levels had returned to normal.

On April 1, 2020, Martin submitted an HSR asking about the plan moving forward for the discoloration on his legs.  Once more, however, that request made no reference about any related pain.  Nurse Wehrle responded to Martin's April 1 HSR explaining that he would be referred to a provider again for review.  On April 20, Martin submitted another HSR about his legs, this time stating that he was feeling burning and aching in the discolored area.  Nurse West responded that Martin would be seen by a provider, and a non-defendant nurse checked on him the very next day.  Dr. Gross saw Martin on April 29, 2020.

According to Martin, he told Dr. Gross at the April 29 appointment that his legs were causing him pain, though Gross denies this and his progress notes for that visit mention only Martin's complaints of dizziness, back pain, constipation, and a desire to go back on Lyrica. Dr. Gross prescribed a laxative and muscle relaxer, and ordered Martin an extra pillow. When Dr. Gross saw Martin again in November and December of 2020, the visits concerned allergies, back pain and knee pain, with no mention of leg discoloration or pain in his notes. On February 10, 2021, Nurse Wehrle also asked Dr. Gross if Martin should see a vascular specialist related to the discoloration of his legs, but Gross instructed Wehrle to "ask the next doctor," as he was no longer working at WSPF by then.

Martin filed several more HSRs about his leg discoloration and associated pain in March 2021, and he was seen by a non-defendant nurse on March 12. That nurse relayed Martin's complaints to another non-defendant, Dr. Sukowaty, who reviewed Martin's medical record and concluded that the discoloration was not an urgent medical issue because his circulation was adequate and he had no symptoms of infection.

On June 30, 2021, Martin met with yet another non-defendant, a nurse practitioner, regarding an unrelated medical issue, though he took the opportunity to again ask about the discoloration on his legs. That nurse practitioner also told Martin that his discoloration was not an acute or urgent issue and advised Martin to submit a separate HSR.

In July 2021, Martin was transferred to Oshkosh Correctional Institution, where he continued to file HSRs, complaining of both pain and discoloration in his legs. In August 2021, a nurse at Oshkosh told Martin that the discoloration might be hyperpigmentation

from long-term minocycline use.  Martin was later referred to a doctor for back pain in September 2021, and after examining Martin's legs, the doctor scheduled a follow-up appointment to discuss the discoloration.  At an October 2021 appointment, that doctor told Martin that minocycline was the likely cause of his discoloration.  Because Martin's folliculitis was still active, the doctor switched Martin to a different antibiotic.  He also advised Martin that the discoloration on his legs was cosmetic and would not interfere with his overall health or function.

OPINION

Plaintiff contends that: (1) Nurse West, Nurse Wehrle, Dr. Ribault and Dr. Gross violated his Eighth Amendment rights by failing to treat his skin discoloration and pain promptly; (2) defendants Sarah Martin (the HSU scheduler), Jaime Adams and Sheryl Kinyon (both HSU managers) violated his constitutional rights by failing to schedule him to be seen in an expedited manner and to ensure that there were enough physicians at the prison; and (3) all of the state defendants were negligent.  The court addresses each claim below.

## I.  Eighth Amendment Medical Care Claims

An Eighth Amendment claim about medical care requires proof that a defendant acted with "deliberate indifference," which means that the defendant knew a prisoner had a serious medical condition requiring treatment but disregarded that need.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Several circumstances can permit a jury to reasonably infer deliberate indifference, such as denial of medical treatment altogether, delay of

9

medical care, continuing ineffective treatment, "a substantial departure from accepted professional judgment, practice, or standards," ignoring an obvious medical risk, or refusing care because of cost. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citations omitted).  However, "negligence, gross negligence, or even recklessness as the term is used in tort cases is *not* enough – the prison officials' state of mind must rise to the level of deliberate indifference." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (emphasis added, citation omitted).

A plaintiff must prove four things to succeed on his Eighth Amendment medical care claims: (1) he had a serious medical need; (2) the defendant was aware that the plaintiff had a serious medical need; (3) the defendant consciously failed to take reasonable measures to provide treatment for the serious medical need; and (4) plaintiff was injured because of the defendant's action or inaction.  Federal Civil Jury Instructions of the Seventh Circuit § 7.17 (2017).  Here, defendants argue that plaintiff cannot satisfy any of these four elements.  In particular, they argue that:  plaintiff's leg discoloration did not present a serious medical condition that required urgent treatment; the delay in treatment did not cause plaintiff any injury; and they did not act with deliberate indifference to his complaints of leg discoloration.

## A. Defendant Medical Professionals

To review, defendants West and Wehrle were nurses who responded to plaintiff's requests for various care on several occasions; and defendants Ribault and Gross were doctors who each saw plaintiff on one occasion regarding his complaints of leg discoloration.  Plaintiff argues that each of these defendants should have done more to

determine the cause of his leg discoloration and expedite treatment for it.  Because these defendants are medical professionals, the most relevant question under the Eighth Amendment is whether their actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996); *see also Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.")  Here, plaintiff has submitted no evidence to suggest that any of these defendants failed to use medical judgment in evaluating and making treatment decisions with regard to the discoloration on his legs.

With respect to Nurses West and Wehrle, plaintiff's medical records show that they responded promptly to each of plaintiff's HSRs and met with him to assess the urgency of his medical needs.  The evidence also shows that these defendants concluded reasonably enough that plaintiff's leg discoloration did not present an emergent or urgent condition, as he had no signs of an infection, such as a fever, and no reports that his leg discoloration was interfering with his daily activities.  Indeed, plaintiff has submitted *no* evidence showing that his condition was urgent *or* that he should have been given priority over the many other inmates on the list to see WSPF's short-staffed medical providers.

Similarly, plaintiff has failed to submit evidence showing that Drs. Ribault or Gross acted with deliberate indifference when presented with his leg condition.  Specifically, plaintiff now argues that both doctors should have recognized that his minocycline

prescription was causing his leg discoloration and switched him to a different antibiotic, as the doctor at Oshkosh eventually did.  However, he offers *no* evidence that Ribault's or Gross's missed diagnosis was such a "substantial departure from the norm" that it supports a finding of deliberate indifference.  *See Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019) (where defendant misdiagnosed a stroke, there was no evidence suggesting "he knew his diagnosis was wrong" or that "he clearly should have known better").  This is particularly true with respect to Dr. Ribault, who was aware of minocycline could cause discoloration, but ruled it out as a cause based on a previous doctor's note suggesting folliculitis as the cause and the apparent timing of the discoloration coming before plaintiff's minocycline prescription.  As for Dr. Gross, his denial of even discussing plaintiff's leg discoloration at any appointment appears to be confirmed by his contemporaneous examination notes.  Even accepting plaintiff's assertion that he complained to Gross about the discoloration and associated pain at an April 2020 appointment, which occurred only a few weeks after plaintiff's appointment with Ribault, plaintiff has again submitted no evidence that Gross should have concluded plaintiff's minocycline was causing a serious medical condition *or* that he required additional treatment, nor would this appear to be at all obvious to a lay jury.

This is true for several reasons.  First, although plaintiff says he complained to both the nurses and physicians about pain and burning in his legs, as well as his concerns about possible blood clots and amputation, he has submitted no evidence that such symptoms would be caused by minocycline-induced hyperpigmentation nor any other medical issue for which the medical defendants could have, or reasonably should have, provided

treatment.  On the contrary, even the Oshkosh physician who ultimately changed plaintiff's prescription for minocycline assured him that the discoloration was cosmetic only.  Thus, no reasonable jury could find it unreasonable, let alone evidence of deliberate indifference, for these medical professionals to fail to link his alleged reports of pain and burning to his minocycline prescription.

Second, the medical defendants did not ignore his condition, but instead, ordered lab tests to ensure that plaintiff's discoloration was not being caused by any serious medical condition, such as an infection or chronic disease.  Generally, those labs revealed no obvious cause of plaintiff's discoloration and only one lab result showed any physical abnormality -- a slightly elevated thyroid hormone levels -- which Dr. Ribault proceeded to treat successfully.

Third, plaintiff was already taking multiple pain medications for other conditions, and he submits no evidence that different or additional medication should have been provided for his alleged leg pain.  And even if he had, his repeated failure to complain about pain in any of his HSRs until the very last hardly preserves this claim.

Finally, even if a reasonable medical profession *could* have inferred that plaintiff's symptoms were being caused by his taking minocycline, plaintiff has failed to show that any of the nurse or physician defendants *actually* drew that inference.  Nor is there basis for a reasonable jury to find that any of those defendants actually believed plaintiff's condition was urgent but failed to act.  *See LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) (prison official does not act with deliberate indifference unless "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and the

official "draw[s] that inference").   Accordingly, defendants West, Wehrle, Ribault and Gross are entitled to summary judgment on plaintiff's Eighth Amendment claims.

### B. Administrative Defendants

Next, plaintiff contends that three, other defendants involved with the administrative operation of the Health Services Unit at WSPF violated his Eighth Amendment rights.   First, he contends that defendant Sarah Martin should have recognized the urgency of his condition and scheduled him to see a medical provider or specialist sooner.   However, HSU Scheduler Martin relied on input from medical staff in scheduling appointments, and *no* medical staff told her to expedite plaintiff's appointments.   Moreover, as discussed above, plaintiff has submitted no evidence showing that a medical professional would recognize his condition as urgent, let alone a scheduler.

Second, plaintiff contends that HSU Managers Jaime Adams and Sheryl Kinyon violated his Eighth Amendment rights by failing to ensure that there were adequate medical providers on staff at WSPF to assess and treat him and other inmates.   This claim fails because plaintiff has submitted no evidence that either defendants Adams or Kinyon had the authority or responsibility to adjust staffing levels and staff hours in the HSU; rather, defendants' evidence shows that they did not.   *E.g., Alexander v. Richter,* 756 F. App'x 611, 614-15 (7th Cir. 2018) (defendants entitled to summary judgment on claim regarding staffing where plaintiff failed to present evidence that defendants had the authority to increase optometrists' hours at the prison in response to delays in eye care).   Nor did plaintiff seek leave to amend his complaint to add an appropriate defendant who was responsible for staffing WSPF's HSU, despite the court's stating in an earlier order that

plaintiff could do so.  (Dkt. #5, at 8.)

Moreover, even if plaintiff had submitted evidence sufficient to hold Adams or Kinyon responsible for staffing levels, he also failed to submit any evidence to support a claim that a deficiency in staffing caused him to suffer a constitutional injury.  Specifically, although some of plaintiff's medical appointments were delayed or rescheduled, there is no dispute that he saw several nurses and physicians during the relevant time period, and none of those nurses or physicians believed that plaintiff's medical conditions required emergent or urgent treatment.  In other words, plaintiff has failed to show that earlier or more frequent medical appointments would have resulted in different or better treatment, and because he has failed to show that the treatment he received was constitutionally inadequate, this claim necessarily fails as well.

## C.  State Law Claims

Finally, plaintiff was granted leave to proceed on negligence claims against the state defendants under Wisconsin law.  However, there is no diversity of citizenship between the parties, leaving this court with the discretion to exercise supplemental jurisdiction over plaintiff's state law negligence claims under 28 U.S.C. § 1367.  The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial. 28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015).  In this instance, since the court is granting summary judgment to defendants on *all* of his federal claims, it will decline to exercise supplemental jurisdiction over plaintiff's remaining negligence claims.

ORDER

IT IS ORDERED that:

1) Plaintiff Donald Martin's motion for default judgment (dkt. #59) is DENIED.

2) Defendant Michael Gross's motion for summary judgment (dkt. #39) is GRANTED.

3) The state defendants' motion for summary judgment (dkt. #30) is GRANTED with respect to plaintiff Donald Martin's constitutional claims.

4) The court declines to exercise supplemental jurisdiction over plaintiff's state law claims, and those claims are DISMISSED WITHOUT PREJUDICE.

5) Defendants' motions to strike (dkt. #62 and dkt. #63) are DENIED as moot.

6) The clerk of court is directed to enter final judgment in this case.

Entered this 5th day of October, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

16